UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NICHOLAS A. GLADU, | ) | |
| Plaintiff | ) | |
| v. | ) | 1:18-cv-00274-GZS |
| JEREMIAH MANNING, | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Jeremiah Manning has moved for summary judgment in this action in which Plaintiff, an inmate at the Maine State Prison, alleges Defendant violated his constitutional rights in February 2018. (Motion, ECF No. 57.)

Following a review of the summary judgment record and after consideration of the Defendant's arguments, I recommend the Court grant Defendant's motion for summary judgment.

**SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## SUMMARY JUDGMENT RECORD

When presented with a summary judgment motion, a court ordinarily considers only the facts included in the parties' statements of material facts, which statements must be supported by citations to evidence of record. Federal Rule of Civil Procedure 56(c) and District of Maine Local Rule 56(b)-(d) require the specific citation to record evidence. In addition, Local Rule 56 establishes the manner by which parties must present their factual statements and the evidence on which the statements depend. A party's pro se status does not relieve the party of the obligation to comply with the court's procedural rules.[1] *Ruiz Rivera v. Riley*, 209 F.3d 24, 27-28 & n. 2 (1st Cir. 2000); *Marcello v. Maine*, 489 F. Supp. 2d 70, 77 (D. Me. 2007).

---

[1] "[T]he Court is required to maintain a strict neutrality between opposing parties and even though a more forgiving reading may be appropriate for a pro se party in the summary judgment context, it is also true that '[j]udges and magistrate judges who review these filings must be able to rely on procedural rules so as to avoid becoming the lawyer for the unrepresented [party] or devoting an excessive portion of their time to such cases.'" *United States v. Baxter*, 841 F. Supp. 2d 378, 383 (D. Me. 2012) (quoting *Clarke v. Blais*, 473 F. Supp. 2d 124, 129 (D. Me. 2007)).

By rule, a party seeking summary judgment must file, in addition to its summary judgment motion, a supporting statement of material facts setting forth each fact in a separately numbered paragraph, with each factual statement followed by a citation to evidence of record that supports the factual statement. D. Me. Loc. R. 56(b). A party opposing a motion for summary judgment must file an opposing statement in which it admits, denies, or qualifies the moving party's statements by reference to each numbered paragraph, with citations to supporting evidence, and in which it may set forth additional facts, in separately numbered paragraphs, with citation to supporting evidence. D. Me. Loc. R. 56(c). Here, while Plaintiff filed a motion to exclude certain evidence submitted by Defendant (ECF No. 67), [2] which motion the Court denied (ECF No. 69), Plaintiff did not file any other response to Defendant's motion or to Defendant's supporting factual statement.

"Facts contained in a supporting … statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f). Additionally, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." *Id.* Finally, "[t]he court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*

## FACTUAL BACKGROUND[3]

Plaintiff is incarcerated at the Maine State Prison. (Complaint ¶ 5; DSMF ¶ 2.) Defendant is employed by the Maine Department of Corrections ("MDOC") as a Correctional

---

[2] Plaintiff sought to exclude body camera footage of the cell extraction which led to his exposure to chemical agents. (ECF No. 67.)

[3] References to Defendant's statement of material facts (ECF No. 58) will be cited as "DSFM ¶ __."

Captain at the Maine State Prison. (DSMF ¶ 1.) In 2018, Defendant was employed as a Correctional Sergeant at the prison. (Complaint ¶ 7(a); DSMF ¶ 1.)

On February 11, 2018, Plaintiff was assigned to the "A-1" section of the Special Management Unit ("SMU") at the prison. (Complaint ¶ 11; DSMF ¶ 3.) The SMU has high risk management prisoners, prisoners assigned to the intensive mental health unit, and prisoners on administrative segregation or disciplinary status. (DSMF ¶ 5.) In the SMU, inmates are afforded showers on a schedule for security and staffing reasons, generally around 7 a.m. or 8 a.m. (*Id.* ¶ 6.) Inmates in the SMU often require greater prison resources to perform tasks, including showers. (*Id.*) On the morning of February 11, 2018, Plaintiff had been offered a shower and had showered. (*Id.* ¶ 27.)

Tray slots on the "A-1" side of the SMU, the side in which Plaintiff was located, do not have a mechanism to prevent an inmate from throwing items out of the slot. (*Id.* ¶ 4.)[4] On February 11, 2018, at approximately 10:10 a.m., correctional staff learned that Plaintiff and another inmate in the SMU had covered their cell windows. (*Id.* ¶ 7.) Inmates are not permitted to cover their cell windows because a cover would prevent staff from seeing inside the cell.[5] (*Id.* ¶ 8.)

A cell extraction team first extracted the inmate in the cell next to Plaintiff. (*Id.* ¶ 9.) During this extraction, Plaintiff uncovered his cell window and threw a meal tray out through his tray slot. (*Id.*; *see also* Complaint ¶ 11.) The tray hit a corrections officer. (DSMF ¶ 10.)

---

[4] The "A-2" side of the SMU had security tray slots that functioned to prevent an inmate from throwing items out of the tray slot. (*Id.*)

[5] Covered cell windows can lead to dangerous situations, including incidents where inmates engage in serious self-injury or devise a trap or ambush for staff. (*Id.*)

Following the cell extraction of the other inmate, shortly before 11:50 a.m., the cell extraction team reentered the SMU A-1 housing unit and went to Plaintiff's cell.[6]  (*Id.* ¶ 11.)  A corrections officer ordered Plaintiff to the tray slot and to "cuff up," meaning to submit to hand restraints.  (*Id.* ¶ 13; Complaint ¶ 11.)  Plaintiff refused to comply with the orders, and Plaintiff placed a small plastic trash bag over his head.  (DSMF ¶ 13; *see also* Complaint ¶ 11.)

The corrections officer again told Plaintiff to submit to hand restraints or be "maced," meaning that chemical agents would be applied.  (DSMF ¶ 14.)  Plaintiff again did not comply with those instructions.  (*Id.*)  The corrections officer opened the tray slot to Plaintiff's cell and applied a short burst of chemical agents (oleoresin capsicum or "pepper spray") into Plaintiff's cell.  (*Id.* ¶ 15.)

The corrections officer once more ordered Plaintiff to the tray slot to "cuff up."  (*Id.*, ¶ 16.)  When Plaintiff continued to refuse to comply with the orders, the officer applied a second short burst of chemical agents into Plaintiff's cell.  (*Id.*)  Plaintiff then complied, took the bag off his head, and submitted to hand restraints.  (*Id.* ¶ 17; *see also* Complaint ¶ 11.)  Plaintiff's cell door was opened and then the extraction team removed Plaintiff from his cell.  (DSMF ¶ 18.)

As the extraction team was escorting Plaintiff toward the A-2 side of the SMU, Plaintiff spit on a corrections officer.  (*Id.* ¶ 19.)  Plaintiff was placed on the ground and a spit mask was applied on him.  (*Id.*)  A member of the extraction team asked Plaintiff if he wanted to be seen by medical; Plaintiff declined to see medical.  (*Id.* ¶ 20; Complaint ¶ 12.)  The officer

---

[6] The extraction team planned to move Plaintiff to a cell on the "A-2" side of the SMU that had a security tray slot.  (*Id.* ¶ 12.)  A security tray slot allows a corrections officer to close an outer slot and in effect functions to prevent an inmate from throwing items out of the tray slot.  (*Id.*)

called a nurse from the medical department at the prison to meet them on the unit. (DSFM ¶ 21.) When the nurse arrived, Plaintiff refused medical treatment. (*Id.* ¶ 21.)

The team escorted Plaintiff to the SMU receiving area in order to change his clothing. (*Id.* ¶ 23.) Plaintiff was provided with a new set of clothing to wear. (*Id.*) After Plaintiff changed his clothing, Plaintiff refused to submit to hand restraints in order to be taken from receiving to a cell on the A-2 side of the SMU. (*Id.* ¶ 24.) When Plaintiff refused to submit to hand restraints, Plaintiff was placed on constant watch; a few minutes later, Plaintiff agreed to be taken to SMU A-2, and he was escorted there without further incident. (*Id.* ¶ 25.) The team removed the restraints from Plaintiff and Plaintiff was not restrained in his cell. (*Id.* ¶ 26.)

At approximately 12:00 p.m., Jennifer Millard, a nurse, went to the SMU for a report of an inmate who had been maced or sprayed with chemical agents but was refusing medical care. (*Id.* ¶ 30.) When Ms. Millard arrived at the SMU, Ms. Millard was advised that Plaintiff had been maced but was refusing medical care. (*Id.* ¶ 31.) Plaintiff refused medical care from Ms. Millard. (*Id.* ¶ 32.) Ms. Millard asked Plaintiff if he was "all set," to which Plaintiff replied, "Yup." (*Id.* ¶ 33.)

Defendant began his shift as the night supervisor at the prison at approximately 6:00 p.m. (*Id.* ¶ 34.) Defendant was the night shift supervisor for the entire facility on that shift. (*Id.* ¶ 52.) At approximately 6:00 p.m., while attending a shift briefing, Defendant learned that Plaintiff had been exposed to chemical agents earlier that day. (*Id.* ¶ 35.) During that briefing, Defendant was advised that Plaintiff had refused to be seen by medical staff and had refused medical decontamination by medical staff. (*Id.* ¶ 36.) Defendant was not involved in the cell extraction of Plaintiff earlier that day. (*Id.* ¶ 37.)

At approximately 7:00 p.m., while Defendant was conducting his rounds in the SMU, Plaintiff asked Defendant for a shower. (*Id*. ¶ 39.) When Defendant advised Plaintiff that he could not allow Plaintiff a shower at that time, Plaintiff began to argue with Defendant about what was required by policy. (*Id*. ¶ 40.) Plaintiff asserted that policy required that he have a shower; Defendant explained that security staff may provide a shower when no health care staff are available, but the Maine State Prison has 24-hour health care staff available. (*Id*. ¶ 41.)

By policy, decontamination must be performed by on-duty health care staff unless health care staff are not available. (*Id*. ¶ 42.) Plaintiff did not ask Defendant to call the medical department or otherwise assert that he wanted to be seen by medical staff. (*Id*. ¶¶ 43, 44.)

Defendant considered Plaintiff to be angry and argumentative with him, but he did not see any signs of injury or trauma. (*Id*. ¶¶ 46, 47.) Defendant also did not observe that Plaintiff was in medical distress. (*Id*. ¶ 48.) Plaintiff, who had a sink and running water in his cell, did not ask Defendant for a towel, washcloth, shampoo, or soap. (*Id*. ¶¶ 45, 49.) Defendant did not have any other interactions with Plaintiff involving a request from Plaintiff for a shower on February 11, 2018, or over the course of the next few days. (*Id*. ¶ 50.)

Showers for inmates in the SMU are offered and performed by staff during the daytime on specific days of the week and at certain times due to staffing needs, to maintain order in the prison, and for security reasons. (*Id*. ¶ 54.) Inmates in the SMU often require greater resources to perform tasks such as showers. (*Id*.) Defendant was not able to offer showers at that time to any SMU inmate, including Plaintiff, because of staffing issues, to maintain order, and for security reasons. (*Id*. ¶ 56.)

7

An inmate can request medical services by submitting a "sick call slip" to the medical department at the prison. (*Id.* ¶ 57.) Plaintiff submitted a sick call slip on February 13, 2018, to request health care services at the prison for an unrelated issue. (*Id.* ¶ 58.) Plaintiff did not submit a sick call slip to request medical care or services for decontamination or for any other reason related to the cell extraction incident that occurred on February 11, 2018. (*Id.* ¶ 59.) During medical rounds, medical staff noted that Plaintiff was awake, had no complaints, and was in no acute distress on February 11, 2018, February 12, 2018, and February 13, 2018. (*Id.* ¶ 60.)

As noted, on or about February 13, 2018, Plaintiff was escorted to the medical department following a separate incident that occurred in his cell. (*Id.* ¶ 62.) During that medical examination, Plaintiff did not report any injuries related to the cell extraction incident that had occurred on February 11, 2018. (*Id.* ¶ 63.)

## DISCUSSION

Plaintiff alleges that Defendant violated his Eighth Amendment right to be free from cruel and unusual punishment by denying him a shower following Plaintiff's exposure to chemical agents.[7] Plaintiff seeks to recover under 42 U.S.C. § 1983.

A claim of constitutional harm caused by a state actor, as Plaintiff has alleged in this case, is actionable under the Civil Rights Act, 42 U.S.C. § 1983, which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State …, subjects, or causes to be subjected, any citizen of the

---

[7] Plaintiff also asserts that his Fourteenth Amendment rights were violated based on the same factual allegations. Because Plaintiff's allegations fail to reflect a violation that resulted in an "atypical and significant hardship … in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 484 (1995), he fails to state a claim under the Due Process Clause of the Fourteenth Amendment.

8

> United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, ….

42 U.S.C. § 1983. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To maintain a claim under section 1983, a plaintiff must establish: "1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Barreto–Rivera v. Medina–Vargas*, 168 F.3d 42, 45 (1st Cir. 1999).

"The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Giroux v. Somerset Cnty.*, 178 F.3d 28, 31 (1st Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "Prison officials have a duty to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* (citations and internal quotation marks omitted).

To raise a genuine issue of constitutional liability, a plaintiff must demonstrate both that he was "incarcerated under conditions posing a substantial risk of serious harm," and that the defendant "acted, or failed to act, with 'deliberate indifference to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). In other words, a plaintiff must satisfy both an objective standard (substantial risk of serious harm) and a subjective standard (deliberate indifference) in order to prove a claim of deliberate indifference. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st

Cir. 2014) (en banc). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

The objective standard evaluates the seriousness of the risk of harm to health. There must be "a sufficiently substantial 'risk of serious damage to [the inmate's] future health.'" *Farmer*, 511 U.S. at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). A medical need is "serious" if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would recognize a need for medical intervention. *Leavitt*, 645 F.3d at 497; *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991)). The subjective standard concerns the culpability of the defendant. A plaintiff must present evidence that the defendant possessed a culpable state of mind amounting to "deliberate indifference to an inmate's health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). Deliberate indifference is akin to criminal recklessness, "requiring actual knowledge of impending harm, easily preventable." *Feeney v. Corr. Med. Servs.*, 464 F.3d at 162 (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993)). The focus of the deliberate indifference analysis "is on what the jailers knew and what they did in response." *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002).

With respect to the objective prong of Plaintiff's deliberate indifference claim, while exposure to chemical agents could conceivably generate a serious medical need, the record lacks any evidence to support a finding that Plaintiff had a serious medical need. The undisputed record demonstrates that Plaintiff refused a medical assessment as well as medical care shortly after the incident on February 11, 2018. (DSFM ¶ 59.) Plaintiff did not submit

any requests or "sick call slips" for medical services related to this incident. (*Id.* ¶ 61.) The medical records reflect that Plaintiff was noted to have no complaints and to be in no acute distress on February 11, 12 and 13, 2018. (*Id.*, ¶ 60.) Moreover, when Plaintiff was evaluated on February 13, 2018 regarding an unrelated medical issue, Plaintiff did not report any injuries related to the cell extraction incident on February 11. (*Id.* ¶ 63.) In addition to the lack of a request for medical attention, the record contains no evidence that Plaintiff had a medical need that was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Kosilek*, 774 F.3d at 82.

Even assuming, arguendo, that the record could support a finding that Plaintiff's medical condition was objectively serious, the record lacks any evidence upon which a factfinder could reasonably conclude that Defendant was aware of that medical condition and failed to address it. The uncontroverted facts establish that Defendant did not observe any sign that Plaintiff was injured or in any distress, and Plaintiff did not request medical attention or report that he needed or wanted to be seen by medical staff. (DSMF ¶¶ 43-45, 47-48, 59.) Defendant denied Plaintiff's single request for a shower based on several legitimate factors, none of which evidence "wanton disregard" for Plaintiff's serious medical needs, *Kosilek*, 774 F.3d at 83.

In sum, the summary judgment record establishes that Plaintiff cannot demonstrate that Defendant acted with deliberate indifference to a serious medical need. Defendant thus cannot establish that Defendant violated the Constitution or laws of the United States.[8]

---

[8] To the extent Plaintiff's Eighth Amendment claim is based on the conditions of his confinement, Defendant would also be entitled to summary judgment. While it is "undisputed that the treatment a prisoner receives in prison and the conditions under which [the prisoner] is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31 (1993), "a prison official cannot be found

11

Even if the record could support a finding that Defendant violated a constitutional or statutory right, Defendant is nevertheless entitled to summary judgment based on qualified immunity. Government officers are entitled to qualified immunity unless they violate a constitutional right that was "clearly established" when they engaged in the conduct at issue. *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). "This strain of immunity aspires to 'balance [the] desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive.'" *Cox v. Hainey*, 391 F.3d 25, 29 (1st Cir. 2004) (quoting *Buenrostro v. Collazo,* 973 F.2d 39, 42 (1st Cir. 1992)).

In its qualified immunity analysis, in addition to determining whether the facts could support a finding of a constitutional violation, a court must assess "whether the violated right was clearly established at the time that the offending conduct occurred." *Ford v. Bender,* 768 F.3d 15, 23 (1st Cir. 2014). That is, the issue is whether at the time, there was clearly

---

liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837 (1994). As noted above, the undisputed facts establish that Defendant did not disregard a known and excessive risk to Plaintiff's health or safety in denying him a shower on a single occasion. *See id.*; *see also Jones v. Wetzel*, 737 F. App'x 61, 64 (3d Cir. 2018) (unpublished) (plaintiff "could not state a conditions of confinement claim against [defendants] for failing to provide him with hygiene products on a single occasion because the deprivation did not amount to an Eighth Amendment violation.").

established law "particularized" to the facts of this case. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017). Neither the record evidence nor known precedent support a finding that when he denied Plaintiff's request for a shower, Defendant violated clearly established law. *See, e.g., Hernandez v. Wood*, Case No. 13-cv-05633-YGR, 2016 WL 1070663, at *22 (N.D. Cal. Mar. 18, 2016) ("For Plaintiff, as for other inmates, the Eighth Amendment does not grant a right to a specific course of conduct (i.e., there is no Eighth Amendment right to a lengthy decontamination shower …)"); *see also J W by & through Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1263 (11th Cir. 2018) ("Recognizing that cases from other lower federal courts cannot create clearly established law for qualified immunity purposes, we note, as well, that the other chemical spray cases we have found—mostly in the prisoner/denial of medical care context—have arisen in different factual scenarios and do not set out definitive or minimum constitutional standards for the decontamination of those who suffer from exposure."). Defendant, therefore, is entitled to qualified immunity on Plaintiff's claim.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendant's Motion for Summary Judgment (ECF No. 57), and that the Court enter judgment in favor of Defendant on Plaintiff's complaint.

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within forty-four (44) days of

being served with a copy thereof.[9] A responsive memorandum and shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 31st day of March, 2020.

---

[9] Federal Rule of Civil Procedure 72(b)(2) provides for a 14-day objection period. The Court, however, recently extended by 30 days any deadline between the date of the order (March 18, 2020) and May 1, 2020. (General Order 2020-2.)